IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MOHAMMED AARABI,

    Petitioner,

v.

WISSAL KERROUM,

    Respondent.

Civil Action No.
1:24-cv-05293-VMC

**OPINION AND ORDER**

The Court held a final hearing on February 6 and 7, 2025 ("Final Hearing") on Petitioner Mohammed Aarabi's Verified Petition for The Return of a Child Pursuant to the Convention on Civil Aspect of Internation Child Abduction ("Petition," Doc. 1) pursuant to the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* (the "Act") and the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"). Petitioner and Respondent Wissal Kerroum appeared with counsel. At the hearing, the Court took the matter under advisement. This Opinion and Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(2). For the reasons that follow, the Court will grant the Petition and order the return of I.A. to Morocco.

**Findings of Fact**

**I.     Alleged Removal and Retention**

Mr. Aarabi is a dual citizen of Morocco and the United States. (Doc. 1 at 2). From 2008 to 2018, he resided in Atlanta, and beginning in 2018 he worked in Kuwait as a translator and interpreter for a U.S. military contractor. Mr. Aarabi currently resides in Morocco. Ms. Kerroum is citizen of Morocco and has conditional permanent residency in the United States. (R.Ex. 4). On August 17, 2021, Mr. Aarabi and Ms. Kerroum were married in Morocco. (P.Ex. 5). Ms. Kerroum moved to Kuwait in December 2021 but returned to Morocco to give birth to the parties' son, I.A. on September 15, 2022. I.A. is a citizen of Morocco and of the United States. (P.Ex. 15).

Shortly after I.A.'s birth, his parents applied for and received a United States passport for him while in Morocco. On or around June 25, 2023, the family spent about two weeks in Atlanta for the purpose of applying for a conditional green card for Ms. Kerroum. With Mr. Aarabi's permission, Ms. Kerroum and I.A. went to the United States from around December 28, 2023 to January 4, 2024 for the purpose of maintaining Ms. Kerroum's green card.

After I.A.'s birth, the family lived together in Kuwait until October 2023. In early 2023, Mr. Aarabi's employer's contract with the U.S. military was revised to prohibit relocating immediate family members to Kuwait. (P.Ex. 29). Mr. Aarabi

testified that he unsuccessfully tried to find a way for Ms. Kerroum and I.A. to stay in Kuwait. Ms. Kerroum understandably did not receive this news well, and based on her testimony at the Final Hearing apparently believed that Mr. Aarabi was responsible for her having to leave. In October of 2023 it boiled over, and the Parties went to a Kuwaiti police station together. Ms. Kerroum testified that they went because Mr. Aarabi hit her, while Mr. Aarabi testified that he went to the police with her to have them explain why she and I.A. had to leave the country.[1]

Although the couple remained together, Ms. Kerroum and I.A. returned to Morocco in October of 2023. Ms. Kerroum testified that while living apart from Mr. Aarabi in Morocco, she and I.A. lived at her parents' home, but that when he would visit they sometimes stayed in a home owned by Mr. Aarabi's family members.[2] Mr. Aarabi testified that when he was in Kuwait, he would see I.A. on

---

[1] The Court of course takes allegations of domestic abuse seriously, and recognizes that if such allegations were true, an order directing the return of I.A. could put Ms. Kerroum in a situation of having to choose between co-parenting I.A. with Mr. Aarabi or avoiding him. But Ms. Kerroum did not allege that I.A. faced "grave risk that his . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," the only relevant exception under the Convention, and therefore the allegations, even if true, are not determinative of the issues in this case.

[2] The testimony and evidence received by the Court regarding Mr. Aarabi's family home, including whether the lease he signed with his brother (P.Ex. 4) was backdated, was inconsistent and unclear. It is also unclear to the Court why it matters at all which house Ms. Kerroum and I.A. were living in while they were residing in Morocco.

3

WhatsApp almost every day. He also provided financial resources to Ms. Kerroum and I.A.

Mr. Aarabi testified that in September of 2024, he quit his job to relocate to Morocco to be with the family. According to a letter from his employer, he submitted his resignation on September 23, 2024 effective October 13, 2024. (P.Ex. 28).[3] He flew to Morocco on September 13 or 14 of 2024 to celebrate I.A.'s birthday.

What happened next is the essence of the Parties' dispute. Mr. Aarabi testified that when he arrived in Morocco, Ms. Kerroum and I.A. were at her parents' home and they would not come out to see him, and so he did not see I.A. Ms. Kerroum testified that Mr. Aarabi came into the home and saw I.A.

On September 16, 2024, one-way tickets for Ms. Kerroum and I.A. from Casablanca, Morocco to New York, United States of America for September 17, 2024 were purchased in cash from a tour agency. (R.Ex. 1). Ms. Kerroum testified that she and Mr. Aarabi bought the tickets together and that the couple agreed that the family would relocate to the United States. Mr. Aarabi testified that he did not know that Ms. Kerroum purchased the tickets. Mr. Aarabi offered two pieces of

---

[3] The Court notes that the September 23 date referenced in the letter post-dates the alleged removal of I.A. as discussed below. Whether Mr. Aarabi made the decision to resign before or as a result of the events surrounding the removal is unclear, but the answer to the question is not material. Even if he intended to resign before the removal, that is not probative of whether he intended to change I.A.'s habitual residence from Morocco.

contemporaneous evidence to corroborate the fact that he did not know that Ms. Kerroum was leaving Morocco: a text message he sent to his boss on September 19 explaining that he could not return to work right away because Ms. Kerroum traveled to the United States with I.A. without his knowledge (P.Ex. 33), and an email sent to the American Citizen Services office at the U.S. Consulate in Casablanca requesting information about international child abduction also sent on September 19 (P.Ex. 34). He also filed a petition with the Moroccan courts on September 23, 2024; the Court discusses this in more detail below.

While the Court does not necessarily find all of Mr. Aarabi's explanations given for his actions credible, Mr. Aarabi's testimony that he did not know Ms. Kerroum was leaving is credible because it is corroborated by the foregoing contemporaneous evidence. Moreover, other evidence leads the Court to conclude that Ms. Kerroum's testimony that she purchased the tickets with Mr. Aarabi is not credible. Specifically, Ms. Kerroum also testified that in September, she sold a piece of gold jewelry for the equivalent of about $700 USD and paid the money to Mr. Aarabi because he needed the money. The plane tickets cost 8,452 Moroccan Dirham, which Ms. Kerroum testified was approximately equal to $900 USD. However, no evidence corroborated her testimony that Mr. Aarabi was in any sort of financial distress; he was still technically employed through October. Moreover, Ms. Kerroum testified that she did not have a bank account and the couple did not

5

have a joint credit card. This raises a reasonable inference that, absent Mr. Aarabi's financial assistance, Ms. Kerroum would have to resort to selling her jewelry to afford plane tickets. All of this further supports the conclusion that Ms. Kerroum departed for the United States surreptitiously.

In any case, after Ms. Kerroum and I.A. landed in New York, they later flew to Atlanta. Hamid Skili, a friend of Mr. Aarabi, booked Ms. Kerroum a hotel room for September 18-20, 2024.[4] (P.Ex. 22–23) Mr. Aarabi testified that he first learned that Mr. Kerroum had traveled to the United States with I.A. from Mr. Skili. Mr. Aarabi testified that a day or so later, he and Ms. Kerroum spoke on WhatsApp and he told her to come back, and she refused.[5]

The parties agree that Mr. Aarabi reimbursed Mr. Skili for the hotel. After staying at the hotel for twodays, Ms. Kerroum stayed with another acquaintance of Mr. Aarabi, Muhammad Nejari, for a few days. Next, she went to stay with another acquaintance, Rashid Al Gharbi, for three weeks. Finally, she went to stay with another acquaintance, Hassane Salhi, from whom Mr. Aarabi rented a basement apartment. Mr. Aarabi paid Mr. Salhi $1,500 on October 20, 2024, $1,000

---

[4] The bookings for the two nights were made separately on separate days, which provides another reason for the Court to believe that Ms. Kerroum's trip to the United States was not planned in advance.

[5] While Ms. Kerroum denied that this conversation occurred, the Court finds his testimony on this point credible for the same reasons the Court credits his testimony that he did not know she departed Morocco.

of which went to rent, and $500 of which was for Mr. Salhi to provide to Ms. Kerroum for living expenses. (R.Ex. 3).

On October 15 or 16, 2024, Mr. Aarabi came to visit Ms. Kerroum and, in his telling, to try to convince Ms. Kerroum to come home. According to Ms. Kerroum's sworn Response to the Petition, "[t]he parties cohabited as husband and wife at Mr. Gharbi's home for a week or two," and "[t]he parties resided in Mr. Salhi's home as husband and wife for about two-weeks." (Doc. 34 at 3). However, at the Final Hearing, Ms. Kerroum revised her testimony, explaining that Mr. Aarabi never cohabitated with her at Mr. Gharbi's house, and that Mr. Aarabi was only living with her at Mr. Salhi's house for a few days, the latter of which was corroborated by Mr. Salhi's testimony at the Final Hearing. Mr. Aarabi saw I.A. for the last time in person prior to filing this case, then went back to Morocco on October 20, 2024 after some debriefing related to his old job. Ms. Kerroum testified that his purpose for doing so was only to resolve some unspecified affairs there. The Parties continued to have contact. Ms. Kerroum found work, and apparently Mr. Aarabi assisted with the application process by translating documents. She also testified that he encouraged her to get a driver's license.

By November, things had changed between the Parties. Neither party paid Mr. Salhi rent for an additional month, and Ms. Kerroum moved to a shelter with I.A. In early November, she stopped allowing Mr. Aarabi to see I.A. via video chat.

7

And she did not respond to Mr. Aarabi when he asked to see I.A. when he came to the United States in December. (P.Ex.16).

## II.     Proceedings in Moroccan Courts

On September 23, 2024, Mr. Aarabi filed a Petition with the First Degree Court of Oujda, Morocco for Ms. Kerroum to return to the matrimonial home with I.A. (P.Ex. 1). That court issued a summons to both Parties on September 30, 2024 for an October 31, 2024 hearing. (P.Ex. 2). Mr. Aarabi or his attorney arranged for service of the summons on Ms. Kerroum's mother in Morocco.

Ms. Kerroum eventually received a copy of the summons from her mother, but she testified that when she asked Mr. Aarabi about it, he told her that he didn't know what it was and was said he was going to ask his brother. She testified that later, when she was faced with eviction from Mr. Salhi's for nonpayment of rent, Mr. Aarabi confessed to having filed it.

A hearing was held on the Moroccan petition on October 31, 2024. (P.Exs. 2, 8). Mr. Aarabi attended that hearing, but Ms. Kerroum did not. The First Degree Court of Oujda entered an Order on November 14, 2024 sustaining the Moroccan petition and directing Ms. Kerroum to return to the matrimonial residence.

On December 12, 2024, Ms. Kerroum, through an attorney in Morocco, filed a petition requesting alimony with the First Degree Court of Oujda due to Mr. Aarabi having abandoned her since November 5, 2024. (P.Ex. 24). The petition

8

sought payment of $1,500 Moroccan Dirhams per month for alimony, plus $3,000 annually for religious holidays. (*Id.*).

On December 12, 2024, Ms. Kerroum, again through an attorney in Morocco, filed a petition to appeal from the November 14, 2024 ruling, arguing that she was not served with the summons, the martial home was in the United States, and that Mr. Aarabi had traveled to the United States with her. (P.Ex. 25).

### III. Proceedings in the United States

The Petition in this case was filed on November 18, 2024. (Doc. 1). Ms. Kerroum could not initially be located for service, but Mr. Aarabi's counsel emailed copies of the filings to Ms. Kerroum, including those seeking a temporary restraining order and other injunctive relief. (P.Exs. 16–18). Ms. Kerroum testified at the Final Hearing that she received at least some of the emails but did not respond or appear, as the Court discussed in its prior Opinion and Order dated December 20, 2024. (Doc. 21). In light of evidence that Ms. Kerroum had notice of the proceedings, the Court had previously issued an Order to Show Cause threatening contempt for her failure to appear with I.A.'s travel documents (Doc. 22). Ms. Kerroum was served with process and certain other Orders, including an Arabic translation of an earlier Order extending the Court's earlier temporary restraining order (Docs. 9, 11) and the Order to Show Cause by the U.S. Marshals Service on January 7, 2025. (Doc. 27). The Court discharged the Order to Show

9

Cause after her appearance through her counsel and compliance with the Court's Orders. (Doc. 32). She filed her Response to the Petition on February 5, 2025. (Doc. 34).

## Conclusions of Law

I.A. was removed to the United States on September 17, 2024, and he was retained here at the earliest when Mr. Aarabi called Ms. Kerroum and told her to come back a day or so later. *Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019) (holding retention date is measured from the date the custodial parent informs the non-custodial parent that she will not be returning to the state of habitual residence). Given these dates, the Court must determine whether removal and/or retention was wrongful under the Convention.

Article 3 of the Convention governs the wrongful removal and retention of children. It states:

> The removal or the retention of a child is to be considered wrongful where:
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3. Thus, Mr. Aarabi has to prove three elements to establish a prima facie case of wrongful retention: (1) that I.A. was a habitual resident of Morocco immediately before his removal to or retention in the United States; (2) that Ms. Kerroum's removal or retention of I.A. breached Mr. Aarabi's custody rights under Moroccan law; and (3) that Mr. Aarabi was exercising his custody rights at the time of removal or retention. *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020). These elements must be proved by the preponderance of the evidence. 22 U.S.C. § 9003(e)(1).

The Convention recognizes affirmative defenses, including that "the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Convention, art 13. Under the Act, an affirmative defense of consent or acquiescence must be proven by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2).

At the Final Hearing, Ms. Kerroum did not contest that Morocco was the habitual residence prior to I.A.'s removal or retention.[6] Moreover, the parties agree

---

[6] In the Court's prior Opinion and Order dated December 20, 2024. (Doc. 21), the Court found that I.A.'s habitual residence was likely Morocco and the Court would adhere to that finding had the matter been at issue. Ms. Kerroum's voluntary resort to Moroccan courts only further establishes that the parties recognized Morocco as the forum for resolving domestic matters.

11

that under Moroccan law, they have equal custodial rights to I.A.,[7] which would be breached by Ms. Kerroum unilaterally taking I.A. to the United States absent his consent, discussed below. *Cf. Abbott v. Abbott*, 560 U.S. 1, 15 (2010). While Mr. Aarabi was not always physically present in I.A.'s life, he was in Morocco to celebrate I.A.'s birthday when Ms. Kerroum departed with I.A., and he continued to exercise his rights by moving promptly under Moroccan and American law to seek Ms. Kerroum's return with I.A. Because Mr. Aarabi has made a prima facie case under the Convention, the burden shifts to Ms. Kerroum to establish the affirmative defense of consent or acquiescence by a preponderance of the evidence.

"Under the Hague Convention's plain, unambiguous language, consent before the removal and retention or subsequent acquiescence extinguishes the right of return." *Romero v. Bahamonde*, No. 1:20-CV-104 (LAG), 2020 WL 8459278, at *10 (M.D. Ga. Nov. 19, 2020), *aff'd*, 857 F. App'x 576 (11th Cir. 2021) (quoting

---

[7] Based on the Court's own research, this appears accurate. Human Rights Educ. Associates, Translation of 2004 Moroccan Family Law (Moudawana), Tit. II, Chap. I, Article 164 ("Custody is the parents' duty as long as the marriage relationship exists."), http://www.hrea.org/wp-content/uploads/2015/02/Moudawana.pdf [https://perma.cc/R5EV-LRTF]. Under Article 14 of the Convention, the Court "may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable."

*Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001)). "The petitioning parent's consent needn't be formal, but it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.* (quoting *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1359 (11th Cir. 2020)). "The focus of the court's inquiry should be on the petitioning parent's 'subjective intent,' and should take into account [t]he nature and scope of the petitioner's consent, and any conditions or limitations on that consent." *Id.* (quoting *Berenguela-Alvarado*, 950 F.3d at 1359).

"The consent defense 'is distinct from acquiescence which addresses whether the petitioner subsequently agreed to or accepted the removal or retention.'" *Id.* at *11 (quoting *Lovenich v. Washington*, No. 3:14–cv–1265, 2015 WL 3650881, at *3 (M.D. Fla. June 11, 2015)). "Acquiescence requires 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period time . . . .'" *Id.* (quoting *Lovenich*, 2015 WL 3650881, at *3). "Subsequent acquiescence requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Id.* (quoting *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999)). "Like consent, acquiescence turns on the subjective intent of the parent who allegedly acquiesced." *Id.* (citing

13

*Lovenich*, 2015 WL 3650881, at *3). "The defense 'is not based on the outside world's perception.'" *Id.* (quoting *Moreno v. Martin*, No. 08-cv-22432, 2008 WL 4716958, at *19 (S.D. Fla. Oct. 23, 2008)). "Additionally, negotiations such as an agreement between parents to allow children to stay in another country beyond a certain date 'should not be translated into acquiescence.'" *Id.* (quoting *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1312 (S.D. Fla. 2004)). "Courts have not found acquiescence, where the petition for the return of the child was filed shortly after the abduction or where the petitioner vigorously attempted to seek custody of his child through other means shortly thereafter the abduction." *Id.* (quoting *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1289–90 (S.D. Fla. 1999)).

First, the Court concludes that Ms. Kerroum has not met her burden on the issue of consent as to the removal of I.A. on September 17, 2024. For the reasons the Court gave above, the Court credits Mr. Aarabi's testimony that he was unaware of Ms. Kerroum's removal of I.A. over Ms. Kerroum's testimony that the two had arranged to travel to the United States together.[8] The focus of the Court's analysis is on Mr. Aarabi's mental state, and the evidence of contemporaneous

---

[8] To be clear, the Court need not conclude that Ms. Kerroum was lying about her understanding about relocating to reach this conclusion. It seems evident from the Parties' argument in Kuwait that the Parties have serious communication issues, and it follows that just as Ms. Kerroum misunderstood Mr. Aarabi's reasoning for sending her to Morocco, she may have misunderstood Mr. Aarabi's decision to leave his job in Kuwait as assent to start fresh in the United States.

14

communications he sent and actions he took, support a conclusion that he was unware of Ms. Kerroum's decision to leave with I.A. and did not consent to removal.

Second, Ms. Kerroum has not met her burden of showing acquiescence to the removal or subsequent retention. While Mr. Aarabi did travel to the United States briefly and spend time with his family there, nothing in the record evidenced an intent for I.A. to reside in the United States permanently. Mr. Aarabi only purchased one month of rent from Mr. Salhi, and it is reasonable to assume that he did so to prevent her from being homeless (which happened eventually anyway). Moreover, both Mr. Aarabi's Moroccan petition and United States "petition for the return of the child was filed shortly after the abduction," which supports a conclusion that he "vigorously attempted to seek custody of his child" and did not acquiesce. *Pesin*, 77 F. Supp. 2d at 1289–90.

Accordingly, the Court concludes that judgment must be entered for the Petitioner.[9]

---

[9] Petitioner's counsel asked the Court to order Respondent to turn I.A. over to Petitioner immediately. I.A. is only two years old and Ms. Kerroum has been his primary caregiver since he was born while Mr. Aarabi, due to his work in Kuwait, was unable to see his child in person for several months at a time. Also, it appears that under Moroccan law, "[c]hild custody shall be awarded first to the mother, then to the father, then to the maternal grandmother of the child." Human Rights Educ. Associates, Translation of 2004 Moroccan Family Law (Moudawana), Tit. II, Chap. I, Article 171, http://www.hrea.org/wp-content/uploads/2015/02/Moudawana.pdf [https://perma.cc/R5EV-LRTF]. With these

## Conclusion

Child abduction cases are always emotional, and the Court can understand why Mr. Aarabi was justifiably distraught by the separation from his child and accusations about his past conduct. Unfortunately, emotions ran high in this case and led to personal attacks on Ms. Kerroum's character, her culture, her religion, and her family that pushed the bounds of zealous advocacy. While cases under the Convention end with an order in favor of one parent, it is naive to think that the Parties' dispute ends here. The Parties face a custody dispute in Morocco and likely will have to co-parent in some respect going forward. The resentment bred by scorched-earth tactics will only hinder this cooperation and does not serve I.A. in any respect.

For the above reasons, it is

**ORDERED** that the Petition (Doc. 1) is **GRANTED** and the Court **ORDERS** I.A.'s return to Morocco. It is

**FURTHER ORDERED** and **NOTICE IS HEREBY GIVEN** that the Court will hold a phone conference on February 14, 2025 at 1:00 PM with the Parties before entering an Order that sets forth specific instructions for I.A.'s return to Morocco. The call-in information is 1-855-244-8681, access code 23103148434.

---

considerations in mind, allowing I.A. to travel back to Morocco with Ms. Kerroum would be preferable.

**FURTHER ORDERED** that the Court's Preliminary Injunction (Doc. 21) is **DISSOLVED,** but the Parties are **ENJOINED** from removing I.A. from the Court's jurisdiction for any purpose other than compliance with this Order. This injunction shall dissolve automatically upon I.A.'s return to Morocco.

**SO ORDERED** this 13th day of February, 2025.

_____
Victoria Marie Calvert
United States District Judge